## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Lisa Coyle, by and through her attorneys, hereby moves for summary judgment on Counts I-V of her Complaint (violation of Title VII, violation of the PHRA, retaliation, aiding and abetting, defamation, and intentional infliction of emotional distress)(Complaint attached hereto as Exhibit A). As set forth below, direct evidence of defendants' illegal animus and discriminatory behavior due to plaintiff's gender and pregnancy establishes plaintiff's entitlement to summary judgment. [1]

Plaintiff experienced both sexual harassment and disparate treatment because of her gender at RepWest. Disparate treatment is any difference in the terms and conditions of one's employment because of a protected characteristic. Luciano v. The Olsten Corp., 110 F.3d 210 (2nd Cir. 1997) . Hostile environment sexual harassment liability on the part of an employer is shown when (1) plaintiff suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir 1999) cert den. 528 US 964 (1999); Anderson v. Deluxe Homes of Pa, 131 F. Supp. 2d at 644. In determining whether a hostile working environment exists, the court must examine the totality of the circumstances. Andrews v. City of Phila, 895 F.2d 1469,

---

[1]    Title VII prohibits discrimination "on the basis of sex." 42 USC 2000e et seq. The Pregnancy Discrimination Act of 1978 clarified that the prohibition against gender discrimination included discrimination against women because of "pregnancy, childbirth or related medical conditions" 42 USC sec. 2000e(k). The law requires that the employer ignore sex or gender when making employment decisions. Luciano v. The Olsten Corp., 110 F.3d 210 (2nd Cir. 1997) .

1486 (3d Cir. 1999); see also Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3d Cir 1997), citing West v. Philadelphia Elect. Co, 45 F.3d 744, 756 (3d Cir. 1995)(stating that the Third Circuit has' precluded an individualized incident-by-incident approach' to determine whether a working environment is sexually hostile.).

With regard to Republic Western's liability,  "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Durham Life Insurance Co. v. Evans, 166 F.3d 139 (3d Cir. 1999).  Accord, Bradley v. City of Philadelphia, 1998 US Dist LEXIS 17672 (ED PA. 1998), citing Farager v. City of Boca Raton, 524 US 775, 118 S. Ct. 2275, 2292-93 (1998).  It is undisputed that defendant James Wallete was plaintiff's supervisor. (Ex. B, Coyle Dep, p. 78, lines 10-13 (78:10-13) ; Ex. C, Wallete Dep 50;5-6).  RepWest is therefore liable for his harassment.[2]

Unlike in most discrimination cases, plaintiff here has direct evidence of discrimination. Wallete's directly derogatory and demeaning statements specifically regarding Mrs. Coyle's gender, her pregnancy and her childbirth, are direct evidence of discriminatory animus.  "Direct evidence" is any form of evidence that directly reflects or references the protected characteristic the employee is suing on.  Walden v. Georgia Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997); Fakete v. AETNA, (3d Cir. 2002; No. 01-2494, filed October 24, 2002) slip op. 4, n. 2. Evidence such as a racial slur, or other direct, negative reference to the protected characteristic,

---

[2]    Even under a standard of coworker harassment, the "open and obvious" nature of the harassment would establish liability for RepWest.  Kunin v. Sears Roebuck, 175 F.3d 289 (3d Cir. 1999 ), cert den, 145 L.ED.2d 310 (1999); Jackson v. T&N Van Service, 2000 US Dist LEXIS 6210 (ED PA 2000).

is "direct evidence" of animus.[3]  "Such evidence leads not only to a ready logical inference of

bias, but also to a rational presumption that the person expressing bias acted on it" when he

made the challenged employment decision.  Starceski v. Westinghouse Elec. Corp. 54 F.3d

1089, 1097(3d Cir. 1995) . . . . [C]ircumstantial evidence is sufficient [to shift the burden of

proof regarding causation], if that evidence can 'fairly be said to directly reflect the alleged

unlawful basis' for the adverse employment decision " Walden, 126 F.3d at 513 (quoting Hook

v. Ernest & Young, 28 F.3d 366, 374 (3d Cir. 1994)(emphasis in original)." . .."  Fakete v.

AETNA, 308 F.3d 335 (3d Cir. 2002); accord, Rose v. NY City Bd. of Education, 257 F.3d 156,

158, 162 )(2d Cir. 2001)(a supervisor's statements, several months before he demoted employee,

that he might replace her with someone "younger and cheaper" were sufficient to shift the

burden of persuasion under Price Waterhouse).

      Direct evidence offered by a plaintiff shifts both the burden of production and the risk of

non-persuasion to defendant.  Price Waterhouse v. Hopkins, 490 US 228, 244-246, 277 (1989);

Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir. 1997), cert den., 118 S. Ct. 1516

(1998); Luciano v. The Olsten Corp, supra (2d Cir. 1997).  An employer can only meet its

burden with "objective evidence" that it would have taken the same actions regardless of these

protected characteristics, Price Waterhouse , 490 US at 252; the Supreme Court rejected as

insufficient the employer's offering conclusory evidence that it would have acted in the same

way in the absence of the protected characteristic.  As set forth below, defendant's harassment

and disparate treatment consisted of : (1) direct indications of hostility toward pregnancy and

childbirth; (2) sexist and harassing comments; (3) biased managerial decisions regarding

---

      [3]  "One form of evidence sufficient to shift the burden of persuasion under Price
Waterhouse is "statements of a person involved in the decisionmaking process that reflect a
discriminatory or retaliatory animus of the type complained of in the suit," Fakete, supra, p. 5.

flextime and compensation; (4) different standards for men and women in attendance, job training and compensation; (5) removal of Mrs. Coyle's authority, taking her outside the chain of command, ostracizing and ignoring her; (6) additional harassing and defamatory conduct; (7) removal of Mrs. Coyle's staff; (8) heightened scrutiny of Mrs. Coyle and other female employees; and (9) requiring women do menial and clerical work not assigned men. Defendant Wallete expressed his hostility for women with children directly, and took negative job actions against plaintiff because of this hostility.   Defendants have produced no evidence in this matter, nor can they, that would meet their burden of proof and persuasion that they would have behaved toward Mrs. Coyle in the exceptionally offensive way they did, but for her gender. [4]

**FACTS**.    Plaintiff Lisa Coyle worked at Republic Western Insurance Company in Ivyland, Pennsylvania as the office's Litigation Manager from June, 1998 until August 28, 2000. In that position, she oversaw litigation by outside defense counsel of those claims insured by RepWest.  From  September, 1999 to January, 2000,  Mrs. Coyle was out on maternity leave for the birth of her daughter Grace.   She  returned from maternity leave to face sustained and relentless hostility toward her from her supervisor, James Wallete, based upon her gender and pregnancy, who proceeded to demote her, exclude her from important office meetings, question and criticize her, and defame her to others in the workplace, including superiors in RWIC's home office in Arizona.  On August 28, 2000, she left the office, unable to continue to function under the continuous discrimination and harassment directed at her by her boss, James Wallete.

## DIRECT EVIDENCE OF ILLEGAL GENDER AND PREGNANCY-BASED ANIMUS

Defendant Wallete engaged in a practice of intentionally sexist, demeaning and hostile

---

[4]   Plaintiff has further suffered harm because of this illegal conduct, in the form of economic loss,  depression, anxiety, insomnia, headaches, and other physical symptoms.  (See, e.g., Ex. D, Report of Dr. Donald Jennings; Ex. B, Coyle Dep, 47:9-10).

behavior toward the women in the office, and Mrs. Coyle in particular, which intensified after she had a baby.  According to Gina Fusca, one of Mrs. Coyle's co-workers,  Wallete "had a real problem with women who were mothers.  He clearly had a problem with me and Lisa because we were mothers of young children." (Ex. E, Declaration of Gina Fusca, p.1)  According to another employee, Margaret Trimble, "Jim wanted Lisa out of the office because she had kids. There was a change in his attitude– it spoke volumes.  After she had the baby, Jim's attitude was clearly that he didn't like her.  He started excluding her from meetings, from everything." (Ex. F, Declaration of Margaret Trimble, p. 1).[5]  "After Lisa had the baby, they gave her a difficult way to go. You could tell it was deliberate, it was intentional.  I don't know how she did her job under the stress they put her under. . .  Steve Sheft was upset – he said, I can't stand what they're doing to Lisa, it's bullshit what they're doing to her." (Trimble Dec, p. 1,3)   When Mrs. Coyle first asked Wallete if she could bring her baby into meet others in the office, Mr. Wallete's response was "don't bring THAT baby in here." (Coyle Dep, 84;12-13).  In contrast, when male employee  Bob Dunstan  told Mr. Wallete that he planned to bring his wife and baby into the office, Wallete replied, "sure-that's a good idea."(Ex. H, Declaration of Lisa Coyle, p. 1). At a 5/11/00 business dinner, attended by Mr. Wallette, Mrs. Coyle remarked on travel problems she had experienced when traveling on American West Airlines, during a trip when Mrs. Coyle was accompanied by her three year old child. Mr. Wallete responded, "no one asked you to bring

---

[5] This hostility was directed as well toward other women in the office with children. "Suzanne Schmitz, another employee, whose son had MS left because of Jim. Jim was cruel to her because she had to take time off for her son. Suzanne would cry because Jim was mean to her . . . Jen McAuley went through the same things after she had kids as well as Gina Fusca." (Trimble Dec, pp 7-8).  Wallete ordered surveillance on Suzanne Schmitz's attendance missed because of her sick child, see, Wallete email 7/19/99. (All e-mails referred to herein are produced in chronological order as Exhibit G).

your kid…that was your problem bringing a kid." (Coyle Dec , 1).[6]    When Mr. Wallete rejected

Mrs. Coyle's proposal for a flexible work schedule (5/24/00) so she could handle childcare

difficulties that had arisen, Wallete told her that

> "my problem was not really a problem but something that I had elected to do–
> "my choice." . . . .. Jim then said, "You should never have had kids. . . I asked
> him who watched his children when they were young. He said, "My wife of
> course– she didn't work." Jim said he asked his wife if the proposal I suggested
> would work and she couldn't work out a solution and he repeated that I should
> never have had kids. Jim wanted to know if my husband knew what I was doing.
> I replied, of course he did and we act in full agreement."

(Coyle Dec pp. 2-3 )(emphasis added). In an e-mail to Ray Sillari (Mr. Wallete's immediate

superior, in the Phoenix Home Office) on Mrs. Coyle's request, Wallete further expressed his

hostility to Ms. Coyle's working while she had children:   "Her priorities are mixed and now that

she has two children her main priority is not her position here…If this arrangement is allowed, I

have 9 other men and women in this office who have children at home who have made special

arrangements everyday, the greatest of which is one partner does not work to take care of the

kids…" (Ex. G, E-mail Wallete to Sillari, 5/23/00).[7]

## SEXIST AND HARASSING COMMENTS

This illegal hostility to Mrs. Coyle's status as a mother was supported and supplemented

by the environment of pervasive sexist and harassing comments at RWIC that were embarrassing

and demeaning to the women in the office.[8]   The men in the office "would use vulgar language

---

[6]  Cathy McNeil confirms that Jim blew up at Ms. Coyle with regard to her son at this
dinner.  (McNeil Dec, p. 2).

[7]  Sillari then wrote piously (and hypocritically) to Mrs. Coyle, "Our children and family
are our number one priority", and told her he would not overrule Jim's refusal to allow her a
flexible work schedule. (E-mail Sillari to Coyle 5/24/00).

[8]   To the extent that this atmosphere was created by non-supervisor co-workers in
addition to Wallete and Sillari (Sillari, Asst. Vice President of Claims, was in the line of

referring to women they spoke to on the phone, calling them bitches and other things. It was offensive." (Trimble Dec 2); accord, Coyle Dep, 152:16-19; Ex. I, Plaintiff's Supplemental Response to Defendant's First Set of Interrogatories, no. 11 and 12 (Newman, Darrows, Anderson, Beddis, and other men in the office referred to women as "bitches"). During the business dinner on 5/11/00, referenced above, Wallete and his supervisor, Ray Sillari, engaged in an extensive discussion of strip clubs:

> "Somehow the conversation turned to a topless bar comment and I [Mrs. Coyle] could hear Dennis [Morrisy] say he didn't go to them. Jack, also loud, said sure, you can be honest with us...your wife's not here . . ." and continued with like comments to which Dennis said he didn't go to those places. Then he mentioned that when Gerry O'Toole left the company, the guys took him out to dinner at a restaurant called "Julie's" and afterward took him to a topless bar. Jack started talking about going after dinner. Jim then picked up on the conversation and questioned Dennis. Then, Jim said, "oh, you waited until after I left that night to have fun." Apparently, Jim had attended the dinner and wasn't aware of the trip to the topless bar that evening. Ray heard Jim and asked him what fun. Jim told him and Ray said it was probably because Gerry wasn't happy with him at that time. Jim agreed and then the two of them started discussing the topless scene and how much fun it was.
>
> I was sitting there and heard it all and getting more and more embarrassed and offended. . . .  I tried to keep the conversation to the sights and restaurants there [in Phila.] but Ray started to talk looking at Jim that a certain someone–they exchanged glances– had taken him downtown to a gentleman's club the last time he went to Phila.  He went on and on about how much he liked them and that on that occasion the "someone" was in another part of the building for a while and that there was some sort of contest going on and he was in the judging with the others and how much fun it was.  Jim added that it sounded great . . . then Ray said, with winks, that "you know, it all came down to measurements at some point" and they all laughed."

(Ex. H, Coyle Declaration, pp. 1-2). [9]  Mrs. Coyle noted that she felt embarrassed and humiliated

---

supervision over Ms. Coyle via Wallete, Wallete Dep, 9:22-10:4), it is legally attributable to Rep West as creating an "open and obvious" atmosphere of harassment not corrected by managers in the company. Kunin v. Sears Roebuck, supra, n. 2; Jackson v. T&N Van Service, ibid.

[9]  This conversation was confirmed by Cathy McNeil, Home Office Technical Supervisor, who was also in attendance.  (Ex. J, Declaration of Catherine McNeil, p. 2); accord, notes of HR investigator Deborah Tooker: "Catherine remembers the dinner. There was some

that her supervisors were discussing how women are judged solely on "measurements."  Ibid.

Other RepWest supervisors in the office did this as well, without reprimand.  On June 19, 2000, during a business lunch attended by Mrs. Coyle, various direct reports, two outside lawyers, and Mike DiBenedetto [Wallete's buddy, hired during Mrs. Coyle's maternity leave, to whom Wallete gave some of Mrs. Coyle's authority after she returned from maternity leave, thus demoting her], were having a discussion of the use of an au pair for childcare.  DiBenedetto, motioning to Ms. Coyle, stated, "Her husband would really like that– having a 19 year old young girl, beautiful, with a good figure and in shape." (Coyle Decl. p 2 ). At a business lunch on 7/13/00, attended by several coworkers including other supervisors, Mrs. Coyle ordered a chicken breast; coworker Charlie Beddis' chicken tenders were not well-cooked, and he remarked that he "coveted [her] breast more than their own meal".  Wallete smirked and smiled, looking at Mrs. Coyle, saying, "oh, I'm not going to touch that, with Lisa sitting right there and all." (Coyle Dep 98:2-6; Coyle Declaration, p. 2). [10]

Wallete directly expressed numerous explicitly gender-specific stereotypes in his dealings with Ms. Coyle:  that women's success is due to their ability to type rather than their

---

talk about a strip joint.  Jim Wallete and Ray Sillari were saying something about it." (Ex. K, Tooker Affidavit, RW 14-17).  Another supervisor present, Thom Matush, noted, "In the bar before dinner, two young guys (Jack S. and Mike L.) mentioned, "maybe we should go to the topless bar."  (RW 16).  Auditor Cathy McNeil also echoed the testimony of Mrs. Coyle, Ms. Trimble and Ms. Fusca with regard to Mr. Wallete's dismissive treatment of her as a woman:  "I had some dealings with Mr. Wallete, who did not treat me with respect, did not return my phone calls, and generally did not seem to have much respect for women." (McNeil Dec., p. 2).

[10]  Other women experienced incidents of harassment, about which nothing was done: Karen Angelicio (a group of male supervisors would hang at the back of the office (including Newman, Beddis, Morrissey, Mike Anderson); one of them made a comment about her rear when she bent over; she took offense and reported, but nothing was done (Coyle Dep, 229:14 - 230:11); and Suzanne Schmitz, who had a child with MS and could not afford to lose her job (Wallete made comments to her, "liked your outfit, liked the cut of it, liked how it was tight, could see through the blouse, wish she would wear them a little shorter.")(Coyle Dep. 231:2-17).

management abilities; that pregnancy changes a woman as a worker; that a woman who is sick must really be pregnant.   On June 22, 2000,  Wallete requested that Mrs. Coyle finalize a reserve reduction project.  When she finished very quickly, Mr. Wallete noted, "You're just a good typist."  When Mrs. Coyle replied that she was just that well prepared, Mr. Wallete stated, "you're just done first because you're a better typist– females are."  (Ex. A, Complaint, para. 14(i); Coyle Dep 85:4-8 ).  On another occasion, Wallete expressed his gender-stereotyped view that bringing a baby to the office would cause too much noise and  "disruptions to every woman in the office who wants to see the baby."  (Ex. G, 5/24/00 e-mail from Wallete to Sillari (RW 103)).  At a supervisor's meeting on 7/26/00, discussing a female employee who was having a baby, Mr. Wallete stated that "who knows what's going on with her– you all know it's an entirely different person you have to deal with after she gets pregnant", looking at Mrs. Coyle. (Complaint, para. 14(l)).  When she  later declined to go out for a drink after work, he remarked to her, "You're no fun since you had that baby," (Coyle Dep.  84:15-16 ), and "you need an attitude adjustment." (Coyle Dep 191:8).   On July 31, 200, after vomiting at work from the stress of dealing with Wallete's harassment, Mrs. Coyle went to his office to tell him she would be leaving work– to discover that again he was having a meeting with all supervisors that she had not been given notice of.  Wallete asked what she wanted, and when she told him she was throwing up, another male employee smirked,  "positive or negative?", to which Wallete replied, "Oh, is she pregnant again?"  (Coyle Decl, p. 3; Coyle dep, 84:16-20). [11]

   Mr. Wallete made inappropriate managerial decisions based on his sexually hostile and

---

[11]. Wallete expressed more of his fixed beliefs about female behavior while Mrs. Coyle was pregnant, telling her repeatedly in front of others that she wouldn't be back after maternity leave.  Mrs. Coyle would deny it and insist she was coming back (which she did).  (Coyle Dec, p. 7; Coyle dep 62:11-16).   Other employees then asked her if she was coming back; the idea that she was not was based solely on statements made by Mr. Wallete  (Ibid.)

discriminatory attitude, both with regard to flex-time (which was permitted all other employees in the office, including supervisors, and denied to Ms. Coyle) (Coyle Dep153;1), (See also Ex. L, chart showing the flex-time schedules of supervisors), and in setting her compensation.  In June, 2000, Wallete responded to Ms. Coyle's questions about her lower-than-expected raise by stating that the figure was reached based upon "the last increase, <u>time missed having the baby,</u> <u>and the prorated time prior to your being out</u> [i.e., when she was working from home due to her pregnancy. . .]. " (6/12/2000 email from Wallete to Coyle)(emphasis added).

    **ATTENDANCE**.  With regard to attendance, women, including Mrs. Coyle, were held to completely different– and higher–standards than the men, a violation of Title VII and the PHRC.  <u>Luciano v. The Olsten Corp</u>, supra, at 216.  Wallete disciplined Mrs. Coyle in her June, 2000 EDP  (her formal employee evaluation) for allegedly poor attendance, and later indicated to Ray Sillari, a higher-up in the home office, that Mrs. Coyle had exceeded her sick and personal days allotment when she had not, leading Mr. Sillari to write, "PA is a right to work state I believe?  It is apparent that Lisa is not cutting the mustard.  Let's discuss a plan of action on Monday."  (RW 80, 8/11/00 e-mail from Sillari to Wallete).[12]  Women were not allowed to be even a few minutes late due to childcare related issues but men could be hours late, and take hours off to play pool with each other at the nearby Ivyland Café, as described by female coworker Marge Trimble:

> Male employees took off all the time in the middle of the day without being disciplined.  We called them "The Old Boys Club"– Jim, Charlie Beddes, Terry Newman, Dennis Morrissey and others– pretty much all the other guys in the office except Steve Sheft.  They would go to the Ivyland Café to play pool and be

---

[12]  This was wrong– in fact, she had NOT exceeded her allotted personal and sick days. Wallete was charging to her half-days that under RWIC's own policies were not to be counted as personal days. (Coyle Dec., p. 7)  Wallete later admitted to Coyle– but not to Sillari, to whom he had defamed her– "<u>You are correct you have not exceeded the allowable attendance absence</u> . . . ."  (Ex. G, 6/12/00 e-mail Wallete to Coyle). .

gone for hours.  Sometimes they didn't come back at all.  Jim would leave to play golf, wearing golfing shorts, and say, If Ray Sillari (home office) calls me, call me on my cell." [13]

Trimble Dec, p. 2.  Gina Fusca confirms this difference in treatment:

> "[W]hen I would come in a few minutes late because I had something come up with my kids, I could tell that that bothered Jim.  It was almost like he was annoyed.  I was hesitant in going into his office to discuss child care related issues.  I found myself so nervous that I frequently inconvenienced my family, my mother & father to rearrange their schedules to pick or drop my kids off or care for them if they were sick.  In contrast, it was common knowledge that the men in the office would take off for more than our one hour allotted lunch breaks during the middle of the day to go down to Ivyland Café to shoot pool.  This was acceptable. . . . If I came in ten minutes late, Jim would note it and bring it up to me later and that would have a bearing on my review regardless if I had made up the time that same week.  All he would remember is the day I was late.  Men would come in one hour late, and that was no problem.  I worked late on numerous occasions, networking on the Republic Western supplied computer from home, sometimes until 12:30 AM.  Lisa, especially when she was getting ready to go out on maternity leave, busted a hump and worked really late hours."

Declaration of Gina Fusca, p. 1-2).  Wallete kept track of the attendance of

women with childcare responsibilities.  See 7/19/99 e-mail from Wallete to Coyle re: Suzanne

---

[13]   Wallete hired both employees and defense counsel based on their ability to play golf with him.  (See, e.g., 11/15/99 letter from Vincent Glorisi (Robinson & Glorisi) to Wallete: "anytime you and your wife are interested in playing golf at the Hopewell Valley Gold Club, I will contact my friend who is a member . . . ".   The letter included directions to the golf course.) In an internal e-mail regarding his hiring of Steve Paolucci, who was recommended by Mike DiBenedetto, Wallete noted: "Paolucci will begin on 5/30. His position is litigation representative and his salary will be $52,500.  We will be extending Cobra payments to him for the 6 months until our coverage kicks in, please include that in his letter.  Please secure for me an extra large golf shirt, for him. Dark Blue if possible."(5/12/00 email Wallete to Deborah Ulan)(emphasis added).  Wallete admitted in his deposition that only Mr. Paolucci and another male were given the special treatment of having the company pay their COBRA until they were eligible for the company's insurance.  (Wallete, 46:19-47:9).  Mr. Paolucci was such a horrible hire he worked exactly one day, then took off several days until he "resigned" on June 8, 2000.  (6/5/00 Wallete letter to Paolucci). Wallete blamed Lisa for this hire to the Home Office, even though she was not consulted, and in fact after she was told he was hired expressed concerns about the hire (Coyle Dep 183:12-20; Coyle Dec. p. 5) and the hire appears to be driven by a desire for a golf partner. Other golfers in the office were Erik Darrows, Newman, DiBenedetto, and Artman. (Coyle Dec., p 5).  Wallete would talk about setting up business meetings with defense counsel on the golf course, and tell Mrs. Coyle that she wouldn't be able to attend them. Ibid.

Schmitz, noting Suzanne's lateness, stating, "says her son is sick, this lateness is seeming to be a more frequent issue. Have you been keeping track?" Office Manager Shannen Crandley would keep notes on women with children who were late to work. (Trimble Dec, p. 3). Wallete had his male employees watch Mrs. Coyle's attendance in particular. (Fusca Dec., p. 2) In contrast, male employees would be gone for hours without reprimand; Terry Newman would come in late, take hours for lunch, and leave before the end of the day. (Ibid.) Wallete would come in later because he disliked rush hour traffic. (Coyle Dep 168; 8-10).

In addition to the above demeaning and harassing sexual comments and different treatment, and explicitly expressed hostility to Mrs. Coyle's having had a baby, Mr. Wallete treated Mrs. Coyle in a harassing and demeaning manner in numerous other ways after her return from maternity leave.[14]

**REMOVAL OF AUTHORITY**.  When Mrs. Coyle returned from maternity leave, she found several forms of her former authority removed from her. Mike DiBenedetto, who was a

---

[14]    It is well established that both statements and actions can create a hostile environment, and both statements and actions can constitute disparate treatment. Walton v. Mental Health Association of Southeastern Pennsylvania, 168 F.3d 661, 667 (3d Cir. 1999)(hostile environment can be shown by any form of treatment that is demeaning, degrading, or in any other way "unreasonably interferes with an employee's work performance," citing Harris v. Forklift Sys., Inc., 510 US 17, 23 (1993); accord, Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996)(acts of harassment motivated by sex or race, regardless of their content, constitute a hostile work environment); Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990)(any discriminatory treatment can establish a hostile work environment; it is not necessary that the act be sexual in content to prove hostile environment sexual harassment); accord, Durham Life Ins. v. Evans, 166 F.3d 139 (3d Cir. 1999)(discriminatory statements and actions establish hostile environment). Similarly, numerous federal courts have held that verbal abuse based on a protected status (which establishes a hostile environment) is also disparate treatment. See, Carter v. Chrysler Corp., 1998 US App. LEXIS 7701 at 17 (8th Cir. 1999)(racial epithets suggest that racial animus motivated other conduct as well); accord, White v. Honeywell, Inc., 141 F.3d 1270, 1276 (8th Cor. 1998), reh. en banc den, 1998 US App LEXIS 11785 (1998); Brown v. East Miss. Elec. Power Assn, 989 F.2d 858, 861-62 , n. 8 (5th Cir. 1993), reh. en banc den., 995 F.2d 225 (1993).

buddy of Wallete's hired in her absence, now had input into her review of the files, which she had previously done by herself.[15]    Two months later, she found that her check approval authority had been taken away from her (Coyle Dep. 64:13-17), and her authority to hire defense counsel limited (hiring of defense counsel was supposed to be within her job responsibilities) (Coyle Dep 316;7-10) Wallete hired new counsel without consulting her (on 2/2/00, 2/28/00, and 3/13/00, Coyle Decl., p. 3); Wallete again hired new counsel on 6/19/00 without her input (Henry Tomlin and John Montemurro, Robinson & Gloriosi, George Psak)(Ex. M, Plaintiff's Responses to Defendant's First set of Interrogatories, no. 17; Coyle Dep 316;7-10 ).

**TAKEN OUTSIDE CHAIN OF COMMAND.**    After Mrs. Coyle's return from maternity leave, Wallete began a pattern of excluding her from her rightful place in the office's chain of command, excluding her from hiring and promotion decisions for her own unit, which was activity clearly in her job description.  On 5/11/00, Mr. Wallete made the decision to hire Mr. Paolucci even after Mrs. Coyle made it clear that she did not want him in his unit due to concerns she had about his ability.[16]    On 5/23/00, Mrs. Coyle was told that she could interview

---

[15]    Again, DiBenedetto was a problematic hire, driven by Mr. Wallete's preference for male employees around him.  DiBenedetto (SIU supervisor) was criticized in Oct, 2000 audit report, which noted that he had not made much progress on the action plan to improve unit performance. (Ex. N, October, 2000 PAFCO Project Audit, p. 2, RW 368 )(Audits attached hereto in chronological order as exhibit N, RW 367-447).  Di Benedetto attempted to bypass Cathy McNeil, the female Home Office Technical Supervisor who approved reserve increases, by requesting a reserve increase in a Pretrial Report, which violated office policy. (3/27/00 e-mail from Aye to DiBenedetto et al).  DiBenedetto  failed to manage his "SIU" unit so that files were handled properly– on numerous occasions, his unit held onto what were properly litigation unit files for seven days before bouncing them back to lit, which automatically added seven days to the lit unit's figures on processing time.(Ex. G, 3/22/00 email from Coyle to Wallete).  Ms. Coyle was called to task for the SIU unit's failures on files (Ex. G,  4/14/00 e-mail from Coyle to Aye, Wallete).  DiBenedetto was not disciplined for his failures in supervising this unit, another difference in treatment.

[16]    (Coyle Dec., p. 5). Paolucci was a disaster, starting work on 5/30/00, working one day, then being out on sick leave until his resignation June 8, 2000.

job candidate Stephen Daveggia, but that Mr. Wallete planned to hire him regardless. (Coyle Decl, p. 3). In contrast, when an interviewee for Steve Sheft's unit came by when Mr. Sheft was out of the office, even though Wallete and Terry Newman interviewed this individual and wanted to make the hire, Wallete held off the decision until Mr. Sheft had an opportunity to interview the candidate himself. (Coyle Decl, pp 3-4). In July, Mrs. Coyle learned that Tom Shea was being promoted into her unit without her knowledge. (Coyle Decl, p. 4).[17]

**EXCLUSION**.   Wallete began a process of excluding Mrs. Coyle from supervisors' meetings, (Trimble Dec., p 1), and refusing to give her a recap of a supervisor's meeting held off-site when Mrs. Coyle was outside the office. (2/23/00 e-mail from Coyle to Wallete). In March, Wallete denied Mrs. Coyle's request to attend a meeting of all units to discuss Process Empowerment; she was discussed extensively at this meeting. (Coyle Dec, p. 4 ). Other supervisors were included in meetings with Mr. Wallete most of the day on 7/31/00 but Mrs. Coyle was not invited to attend. (Ibid.). On another occasion, a supervisors' meeting was held without notifying Mrs. Coyle; she came to Mr. Wallete's office on a different matter and discovered the meeting in progress, regarding the hiring of personnel, a meeting in which she should have been included. (Ibid.) On 7/12/00, the weekly supervisors' meeting started without Mrs. Coyle because she was late; the week prior, the start time of the meeting was delayed so Steve Sheft, who was late, could get there. (Ibid.). When male supervisors were late, Wallete would also go get them, or hold a second meeting that included them. (Ibid.).

## ADDITIONAL HARASSING BEHAVIOR AND DEFAMATORY CONDUCT

In addition to the creation of a sexually harassing atmosphere through the statements

---

[17]   This disrespect spread to others. When John Aye sent around a request for the review of the litigation section of the manual, he left off Mrs. Coyle's name, prompting Steve Sheft to write: "Will someone please inform this gentleman that LISA DOLAN-COYLE is Lit Mgr for this office– Gee, Thx." (5/12/00 e-mail Sheft to Aye).

detailed supra at pp 6-10, supra, Wallete created a continuing atmosphere of derogation and

humiliation toward Mrs. Coyle by alternatively ignoring her and criticizing her. In May, 2000,

Mr. Wallete held a wrap-up session in his office at which all supervisors were present. At that

time, Mrs. Coyle remarked that she had submitted her EDP to Mr. Wallete for his review. He

said, with a smirk, "your version" and Mike DiBenedetto added "the fictional account." (Coyle

Dep 99:5-10) Even though Mrs. Coyle worked very hard from home during her disability leave

from June through August, 1999 with Mr. Wallete's permission, Mr. Wallete told her, " you

didn't do any real work then." (Coyle Dec, p. 5). On 5/31/00, Mr. Wallete told Mrs. Coyle he

was "glad to have you back" to which Mrs. Coyle responded "I never left – doing my job every

day." Mr.Wallete replied, " No, I mean here" pointing to his head. (Coyle Dep 340:5-16).   On

7/12/00, during a supervisors' meeting, Mr. Wallete read Mike Linn's exit interview aloud.  Mr.

Linn was severely critical of Ms. Coyle, calling  her "horrible", and saying Mr. Wallete was

"fair" (to put this remark in context, Mrs. Coyle had reported Mr. Linn's sexual harassment of a

young female temp to Wallete, who did nothing about it and did not discipline Linn (Ex. I,

Plaintiff's Supplemental Response, #11, 12); she had also disciplined him for performance and

recommended he be sent to SIU.)  Wallete stated the purpose of the recitation was to let them

know that Mr. Linn was a disgruntled ex-employee; however, there was no need to detail his

specific and extensive insults to achieve that objective.  (Coyle Dep 260;4-8).  The obvious

purpose was to humiliate Mrs. Coyle.  After the meeting, other supervisors (Newman and

DiBenedetto) told Mrs. Coyle that she "suck[ed]". (Coye Dep. 260:9-21).

     Mr. Wallete slandered Mrs. Coyle's reputation with others higher up in the company. On

7/26/00, Bill Artman informed Mrs. Coyle through conversation with Lollie Bending of Home

Office that Mr. Wallete had slandered her professional reputation in the home office by stating

that Mrs. Coyle was never in the office, and was responsible for the Paolucci fiasco. (Coyle Dec, p. 5; Coyle 183:12-20).   Mr. Wallete criticized Mrs. Coyle's work product to others in the office, blaming her for the problems in the office. (Fusca Dec 3).

Wallete also lied to higher-ups in the company about Ms. Coyle's attendance after she returned from maternity leave, telling Sillari that she had missed 12 days already that year "after being out from [her maternity leave]", a violation of company policy on sick and personal days (ten per year). (5/23/00 email Wallete to Sillari, RW106; 8/11/00 e-mail Wallete to Coyle (RW 87).  (He also wrongly disciplined Mrs. Coyle for attendance in her evaluation that year. See Ex. O, (Coyle eval, 6/26/00)).  He later admitted that,"**You are correct** you have not exceeded the allowable attendance absence." (6/12/00 email Wallete to Coyle)(emphasis added).

Wallete also began overtly shunning Mrs. Coyle.  On 7/10/00, Mr. Wallete entered Mrs. Coyle's office to give Bill Artman a phone message; when she spoke to him, he ignored her and did not speak to her for the remainder of the day. (Coyle Dec, p. 4 ) On four other occasions within the next week he deliberately avoided speaking to her.  (Ibid).  Mrs. Coyle testified, "Jim wasn't speaking to me.  It was as if I was a leper in the office."  (Coyle 230:15-18).  According to Margaret Trimble, after Mrs. Coyle had her baby, "he (Mr. Wallete) stopped going back to her office to talk to her," and openly shunned her, for the purpose of getting her to quit her job. (Trimble Dec 1).   According to Ms. Trimble,

> "you could tell when Jim wanted you out. They wouldn't fire you, they wouldn't lay you off, they would deliberately and intentionally make it more difficult until you couldn't take it any more.  They did that with Lisa Coyle. In the olden days they would shun you – it was like that. It got really bad with Lisa after she had the baby.  Jim and his buddies would exclude her, send her nasty e-mails, be mean to her, and watch her really closely.  Jim would give Lisa dirty looks. Once I came into Lisa's office, and she had just read a nasty e-mail from Jim—she was crying, crying just terrible. . . . It was hell in that place."

(Trimble Dec 1-2). Gina Fusca had similar experiences with Wallete, in which he harassed her about her childcare, graded her down on her EDP (see Fusca Dec 3-4), and overall made it impossible for her to function: "Jim's lack of flexibility with child care and the way he harassed women who were mothers made it really difficult to function in that office. Working for him really ruined me.  Because of this, I have the misconception that every work environment is like this and am currently a stay at home mom.  While I worked there, I was short-tempered with my kids and resented them because of pressure at work."  (Fusca, Dec 2)(emphasis added).  Like Mrs. Fusca, Mrs. Coyle has struggled with this fear, and has been unable to return to work after her experiences at Republic Western. [18]

**REMOVAL OF HER STAFF**.  Despite an increased workload from numerous "reserve review" projects, Mrs. Coyle was stripped of the staff needed to do the work, which contributed to her job stress, constituted an adverse job action, and constituted illegal harassment. Evans v. Durham Life, supra (adverse job action, harassment); Luciano v. the Olsten Corp., 912 F.Supp. 663 (2d Cir. 1997)(being given greater job responsibilities without commensurate support staff). On May 22, 2000, Home Office Technical Supervisor Cathy McNeil noted in an e-mail to Mrs. Coyle: "I told John Aye about the loss of personnel in your unit.  He was not happy that they were being taken out of Lit and put into SIU [to ease the workload of Wallete's buddy, Mike DiBenedetto].  He questioned Ray [Sillari, Jim's immediate supervisor,  who went to strip clubs with Wallete] about it, but basically was told these moves were needed to help the PA office. John did ask if once we have replacements could the prior adjuster's stay in the position for a week or two to help train the new adjuster.  I don't know that, that will be done though."  Mrs. Coyle asked for help.  In April, Mrs. Coyle requested that Mr. DiBenedetto take over some of

---

[18]  See Ex. P, Lisa Coyle's medical notes, Dr. Rosella, 6/8/01: "Fears returning to work and has anxiety panic attacks thinking of this."; Ex. D, Report of Dr. Jennings.

her files after an employee left, leaving 140 files unattended, including numerous serious/fatal and large loss files reported to Home Office. (4/24/00 e-mail Coyle to Wallete). Wallete's response was "I will let you know"; he never gave her help. In August, with her Department down to one full time employee with no litigation experience; one temp who needed constant supervision; and one temp just fired for incompetence, she requested that Wallete give her authority to hire someone else; he did not. (see 8/10/00 email to Wallete re: "reserve reviews."). Mrs. Coyle again requested help in an 8/21/00 e-mail to Wallete (RW 72), stating, "I presently have a great need in litigation. I need to make the arrangement to have Tom immediately as promised in order to complete the reserve project and assume files badly in need of a handler. Bob Dunstan and Derrick are woefully inadequate to handle the backlog in addition to the high volume of incoming suits and the on-going projects." Wallete's response was no: "Tom is involved in a very difficult storage case and I cannot let him go from the unit." (RW 72, 8/21/00). When Mrs. Coyle left on August 28, 2000, unable to continue, she had just been told to go through 600 files by September 1, and have all reports done on those files. (Ex. P, Med notes of Dr. John Rosella, 12-5-00; Coyle Dec, 7 ).

**JOB TRAINING**. Mr. Wallete treated Mrs. Coyle differently than other male supervisors with regard to job training opportunities. On 3/1/00, Mr. Wallete denied Mrs. Coyle's request for training, which male supervisors received. (Coyle Dec, 5) On 6/19/00, Mrs. Coyle was denied substantive training for a half-day session 15 minutes from the office. (Ibid.) Jim, Mike DiBenedetto and Terry Newman were selected for training in Arizona for the week of 6/26/00 and Mrs. Coyle was not allowed to participate. (Ibid.) The men later said they had golfed the whole time (Ibid.).

**COMPENSATION**. Mr. Wallete treated Mrs. Coyle differently than other employees

regarding the Company's review and compensation procedures (any salary increase was held up

until the review was done). Mr. Wallete's policy was that EDP's were due four weeks prior to

the employee's anniversary date, which for Ms. Coyle would have been 4/20/00. (Coyle Dec, 6).

Despite persistent requests, Mr. Wallete did not write Mrs. Coyle's EDP until 6/9/00, it was not

finalized until 6/20/00, and he refused to make the increase retroactive. (Ibid. ) Similarly, Gina

Fusca never received her EDP increase, despite asking for it for the five months following her

EDP. (Fusca Dec 4). In contrast, Mr. Artman's increase was made retroactive, by order of Jim

Wallete. (Coyle Dec 6).

    **HEIGHTENED SCRUTINY**. Wallete treated Mrs. Coyle differently than male

employees with respect to the level of scrutiny she received that male employees did not, a

violation of Title VII. See, <u>Ford v. Gen. Motors Corp.</u>, 9/27/02, no. 01-5060 (6th Cir.

2002)(heightened scrutiny and increased workload were discriminatory and adverse employment

action). At the end of April, Mrs. Coyle was personally audited by Thom Matush, the head of

the audit team and Cathy McNeil, the Home Office Technical Supervisor, while other

supervisors were not (McNeil Dec 1, Coyle Dec 6). The audit revealed no problems with her

files.[19] Mr. Wallete had people in the office keep an eye on Mrs. Coyle: "Jim frequently would

ask some of his favorites in the office to keep an eye on Lisa regarding what she was doing in

her office, her phone usage and her comings and goings. Lisa's phone usage, in particular, was

no different than any other in the office." (Fusca Dec 2). Margie Trimble also confirms that

---

    [19] Mrs. Coyle's appropriate file management was in contrast to the results of the full-
office audit performed in May of 2000, which revealed significant problems with the initial
adjusters– individuals outside the litigation unit– setting reserves. (See, Mc Neil Dec, p 1-2 re:
Mrs. Coyle's files; see reserve issues discussion below). The audits and other intracompany
documents, to the extent that they discussed reserves at all, demonstrated that adjusters in the
initial claims stages, particularly bodily injury, were setting reserves too low, refusing the settle
cases at the "claims" stage, when they could have been settled more cheaply, and holding onto
the file for too long, then "dumping" the file on the litigation unit when the case went into suit.

"Jim put a really close scrutiny on matters Lisa worked on, trying to catch her doing something wrong. If Lisa authorized a check, Jim would have Shannon, the office manager check it- if there was one dot wrong, Shannon would race into Jim to tell him. They did not do that to other employees. If Lisa sneezed the wrong way, Shannon knew it and repeated it to Jim." (Trimble Dec 3-4). Mr. Wallete questioned Mrs. Coyle's work product on other issues such as her reasons for a late reserve change (Jim demanded a full explanation for late reserve changes, in contrast to other supervisors, who were allowed to say, "I reviewed the reserves and they are appropriate." Coyle Dec 6).

**MENIAL AND CLERICAL WORK**.  On 7/10/00, Mr. Wallete ordered Mrs. Coyle to vacuum her office; no other supervisors (who were all men) were ordered to clean. (Coyle Dec, p. 6 ).   On 7/13/00, Mrs. Coyle was assigned by Mr. Wallete to do clerical work not assigned to any other supervisor; Wallete assigned Mrs. Coyle and the other woman in her unit, Belinda Weedon, the task of maintaining the suit log even though the office had clerical personnel to do this.  (Ibid.).

**FLEXIBLE SCHEDULE**.  When Mrs. Coyle requested consideration of a partial work-at-home schedule for a few months to deal with childcare issues, Wallete told her that no positions from that location were available then or in the future.  (Coyle Dec, 3).  This was false. On  6/21/00, Mrs. Coyle witnessed Wallete offer Bill Artman a position as an SIU supervisor, which for several months would be strictly a work-at-home position.  (Ibid.)  Mr. Artman told Mrs. Coyle that Wallete had forbidden Home Office employee  Bending to let Mrs. Coyle know about the job.  (Ibid).  Mrs. Coyle appealed to Ray Sillari and John Aye in the Home Office for their consideration of her request for a flexible work schedule, which Wallete had denied; they

told her the decision was entirely up to Mr. Wallete, since he ran the office.[20]

**AFFIRMATIVE DEFENSES**.    Republic Western has claimed to have an anti-harassment policy that insulates them from liability for Wallete's actions.    First, because Wallete was a supervisor, the company is directly liable for his actions.    Evans v Durham Life, supra.[21] Second, even for co-worker harassment, where the law allows a company to offer the defense of a well-publicized, enforced anti-harassment policy, see, Ellerth v. Faragher supra, the evidence establishes that defendant had no policy that was known to employees (Coyle Dep 189;18-22; Trimble Dec 4, Fusca Dec 3-4).    Even if there were a policy, as set forth herein, it was obviously not enforced.    (See, Ex. Q, Defendants' Responses to Plaintiff's First Set of Interrogatories, no. 4)(no  RepWest Ivyland employees disciplined for violation of company's alleged "anti-harassment" policy).[22]    In addition to the harassment of female employees as set forth herein in the previous twenty pages, there were also incidents of racial discrimination:

---

[20]    Mr. Aye noted, "I cannot imagine a circumstance where I would attempt to be involved in over ruling Jim in a decision of this nature.  If I am ever asked for an opinion I would give his decision my complete support."  (5/24/00 e-mail from Aye to Coyle).  This is an individual that defendants claim Mrs. Coyle should have reported Mr. Wallete's harassment to. As to Sillari, he also indicated his complete support for Jim's authority over Mrs. Coyle, and, on a personal level, was Wallete's buddy, who took Wallete to strip clubs.  When Mrs. Coyle announced her pregnancy, Sillari sent her an e-mail remarking, "My calendar says your time in Phoenix was well-spent", referring to the supposed date of conception (2/26/99 email Sillari to Coyle).  Wallete also commented on the conception of her baby, noting to Mrs. Coyle, 'I can see what you were up to in Phoenix" (Coyle Dep., 62:8-16).  Sillari aided and abetted Wallete in creating the hostile environment, discussing their trips to strip clubs openly, and supporting Wallete in denying Mrs. Coyle the flex-time open to every other supervisor.  He was hardly someone who would stop Mr. Wallete in his harassment.

[21]    In addition to being her acknowledged supervisor, Wallete took tangible adverse job action against her with regard to, inter alia,  flex-time, her employee evaluation, reduction of staff and demotion in duties, and compensation. Evans v. Durham Life, supra.

[22]    What has been produced as the company's "policy"- which is U-HAUL's policy– does not in fact list pregnancy as a prohibited basis, nor give examples of what constitutes sexual harassment.  It is legally deficient even on its face. (Ex. R, U-Haul Sexual Harassment policy).

"Bill Artman, hired after Jim, called a young black man 'Buckwheat.' This young man was very nice, was on the fast track. He is no longer with the company, and I believe he sued them. Once we were going to get together for birthday cake for an employee's birthday and somebody announced, cake for everyone. Bill said, in front of Fred Marr (a black BI adjuster), 'Only white folks are invited.' I was embarrassed. Bill would say to Tracy, a black employee, 'come into my office, Tracy, you're my sweet black-eyed pea.' The younger the girls, the better he liked it. **That's the kind of stuff they did there-no one made it stop. There's a fear factor, fear of being retaliated against and losing your job if you complain.**"

(Trimble Dec 2)(emphasis added).[23]  Obviously, equal employment opportunity was not enforced in the Ivyland Office, and the failure was open and obvious.

**RETALIATION**:   Under Title VII, it is "unlawful for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice." 42 USC 2000e-3(a).  Liability under the PHRA tracks Title VII liability. Dici v. Com of Pennsylvania, 91 F.3d 542 (3d Cir. 1996).  When Mrs. Coyle complained about Wallete's violations, nothing was done, and in fact, Wallete increased his harassing treatment.

As noted above by Mrs. Trimble, there was an atmosphere of fear and intimidation at RepWest that made it clear that complaints of EEO violation would not be well-received. Despite this, Mrs. Coyle did complain about Mr. Wallete: Mrs. Coyle reported Wallete's illegal behavior to numerous supervisors throughout the company, starting with Wallete himself, telling him to stop it, continuing to Cathy McNeil, and on to Sillari (Coyle Dep 189:5-8) and John Aye (Coyle Dep177:22-178;1).  She also complained to Belinda Weedon and Bill Artman.  (Ibid.) As noted above on the previous two pages, Mrs. Coyle challenged Mr. Wallete's denial of her flex-time to higher ups Aye and Sillari; they  told her they would not overrule Wallete (Sillari was also Wallete's personal buddy).  She reported to Sillari that Wallete was ignoring and excluding

---

[23]     When Belinda Weedon, who is black, was hired by Mrs. Coyle into her department, Wallete told her, "Home Office isn't happy with this– they don't want any minorities at Republic Western."  (Ex. M, numbers 11 and 12.)

her, which also yielded no improvement (and in fact, Wallete got worse). (Coyle Dep 191:7-14). When Mrs. Coyle complained to Sillari about Wallete's excluding her in early May, 2000, Wallete wrote an angry e-mail to Sillari noting her complaint about him (RW 106 5/23/00 email Wallete to Sillari: "Lisa felt obligated to report to you her disconnect feelings she had with the office while you were here for the audit . . ") and increased his harassment in retaliation, becoming even more cutting and demeaning, and delaying her evaluation and raise (Coyle Dep192:12-13 ).[24] HR was no help; when she sent a detailed letter to the Human Resources Department, they did an investigation without even interviewing Wallete (Ex. K, RW 14-17). In its "investigation," the Department noted that "Lisa has sent an e-mail to Mike Hickson and Ray Sillari– complaining about Jim Wallete" (RW 16); then, in direct contradiction to their own notes, stated in the same paragraph that "Lisa Coyle has made no attempt to contact or speak directly with Mike" (RW 16). This is obviously untrue; she did contact him via e-mail.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Hoy v. Angelone, 720 A.2d 745 (1998). As detailed above,[25]

---

[24]    Mrs. Coyle's complaint was specific to Wallete, and stated that he was not communicating with her, and was excluding her from team activities. Mrs. Coyle was the office's nominal second in command, and Mr. Wallete was supposed to maintain clear communication with her. (Ex. S, RW 607).

[25]    This conduct included (1) direct indications of hostility toward pregnancy and childbirth, including statements such as "You never should have had kids"; (2) sexist and harassing comments; (3) biassed managerial decisions regarding flextime and compensation; (4) different standards for men and women in attendance, job training and compensation; (5) removal of Mrs. Coyle's authority, taking her outside the chain of command, ostracizing and ignoring her; (6) harassing and defamatory conduct; (7) removal of Mrs. Coyle's staff; (8) heightened scrutiny of Mrs. Coyle and other female employees; and (9) requiring women do menial and clerical work not assigned men.

Wallete's extreme conduct toward Mrs. Coyle and the other women in the office, because of which Mrs. Coyle has suffered severe depression, inability to work, and physical harm such as headache, insomnia, and stomach problems.  (Coyle Dep 47:9-10; Coyle Dec., p. 7); which Marge Trimble described as "It was just hell in that place"; and Gina Fusca says "ruined" her such that she has not been able to return to work for over two years, demonstrates the extreme and outrageous nature of his conduct.  Mrs. Coyle has suffered bodily harm therefrom.[26]

**DEFAMATION.** [27]   As set forth on pp 15-16 above, Wallete defamed Mrs. Coyle to individuals in the Home Office, and others in the Ivyland Office.  He falsely blamed her for problems in the office (Fusca Dec , p. 3); falsely told Sillari she violated work rules on attendance (see, p. 16, supra); falsely impugned her business performance by repeating the slanders of Mike Linn and blaming her for the Paolucci disaster (see p. 15, supra); and falsely

---

[26]   Retaliation for making a complaint of discrimination also establishes the tort of intentional infliction.  Hoy v. Angelone, supra, slip op. at 29-30.  As set forth above, pp 22-23, Wallete retaliated against Mrs. Coyle.

[27]   Under Pennsylvania law a cause of action for defamation requires a defamatory communication, published by defendant, applied to the plaintiff, understood by recipients to have a defamatory meaning, and understood to be intended to apply to the plaintiff, resulting in special harm.  42 Pa. C.S.A. § 8343(a).  One of the four categories of defamation per se includes statements imputing business misconduct.  "Business misconduct" includes "anything likely to discredit the plaintiff in his trade or business." U.S. Healthcare v. Blue Cross of Greater Philadelphia, 898 F.2d 914 (3rd Cir. 1990). Defamation per se need not show injury to reputation; emotional injury is sufficient.  Carey v. Piphus, 435 U.S. 247 (1978) ("statements that are defamatory per se by their very nature are likely to cause mental and emotional distress, as well as injury to reputation, so there arguably is little reason to require proof of this kind of injury") (emphasis added); ( Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) (actual damages resulting from defamatory untruths are not limited to monetary loss, but include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering").  See also, Restatement, Second of Torts, section 621, comment b ("actual injury" is held to include "personal humiliation, and mental anguish and suffering"; impairment of reputation not required before damages for emotional distress can be awarded.).  With regard to any privilege, conditional privilege is lost when the publication is actuated by malice or improper purpose, Guardian Life Ins. Co. Of Am. v. American Guardian Life Ins. Co, 943 F.Supp 409, 527 (EDPA 1996), as, e.g., illegal animus, such as was demonstrated by defendant Wallete. Plaintiff suffered significant emotional harm and loss of reputation from Wallete's false statements about her.

suggested that she was lying in her EDP to other supervisors (see p. 15 supra). These facts are undisputed. Wallete admitted in his deposition that he said negative things about Mrs. Coyle to John Aye (in Home Office), that Mrs. Coyle's "attendance was an issue, that she was missing a lot of time." (Wallete, 122:20-123:5). Outside of this one item, Wallete expressed complete loss of memory as to any other thing he said about Mrs. Coyle to anyone at Republic Western (Wallete, 121:11-122:13). Mrs. Coyle, on the other hand, and Ms. Fusca and Ms. Trimble, have a vivid recollection of the negative statements he made about Mrs. Coyle.

**AIDING AND ABETTING**.[28] As set forth on pp. 6-8, 16, Wallete and the "Old Boys Club" of Newman and DiBenedetto worked in concert to create a sexually harassing environment in the office, either intentionally or in reckless disregard of Mrs. Coyle's rights under law. Wallete, Sillari and Aye worked together to deny Mrs. Coyle the flex-time that all other supervisors enjoyed (see p. 10, supra).

**DEFENDANTS' "RESERVING ISSUE" IS A RED HERRING**. Defendants have claimed in this litigation that Mrs. Coyle is responsible for serious underreserves at RepWest uncovered by the spring, 2000 audit. (Ex.T, 5/3/01 letter from U-Haul HR responding to Coyle's PHRC)(RW58). <u>First, and it cannot be emphasized too strongly, **poor performance, even if established, does not constitute a defense to illegal harassment**. If an employee is not doing well in his or her job, the law does not allow the employer to respond to such failures with insults, improper touching, racial or gender slurs, or other various forms of illegal harassment.</u>

Second, there is absolutely no factual basis whatsoever for defendants' claim that Mrs. Coyle was to blame for the extreme reserve shortfall the company experienced in 2000 (or subsequently). The evidence in this matter reveals the following uncontested facts:

---

[28]    It is a violation of the PHRA to "aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 PaCSA section 955.

**1) <u>EVERYONE in the office (37 people) was responsible for setting reserves; Mrs. Coyle was responsible for only a very small part of the overall reserving process</u>**.

Reserves are first set clerically, when a claim is received by the office.  (Wallete Dep 76:17-18; Coyle Dep 128:6-9 ).  Next, the reserve is reviewed, and, if necessary, adjusted, by a claims adjuster or representative in any one of numerous Departments (e.g., BI (Bodily Injury, or the casualty Department); property loss; SIU (Special Investigations Unit), SIR).  (Wallete Dep 89:13-14;  Coyle Dep 128:6-9).  If that adjuster has difficulty, the claim is reviewed by the supervisor of that unit.  (Wallete Dep 74:11-18).  <u>At each stage, each employee is responsible for checking and changing, if necessary, the reserve on that claim</u>. (Wallete Dep 89:16-20)(Coyle Dep 81:12-15 )[29]. Each adjuster is to reserve to full exposure at all times. (See Wallete Dep 100:15-18, Coyle Dec 6):[30]  All of this activity happens OUTSIDE the litigation unit, <u>and can obviously be done correctly or incorrectly</u>; if it is incorrectly done, the reserve will be wrong. Many claims come into the company and are resolved or paid at that level, never reaching the litigation unit; these claims also had reserves set on them, which were set by the adjusters and supervisors of that division (e.g., BI), in conjunction with Wallete (if a reserve increase exceeded their authority), and, if over Wallete's authority, the Large Loss Committee in the Home Office. (Coyle Dep 79:11-13;    Wallete Dep 74:6-17).  Again, these decisions were <u>not</u> under the supervision of Mrs. Coyle, and can hardly be attributed to her; they were under the authority of Wallete and other unit supervisors.  Within the company, 32 employees <u>outside</u> the litigation

---

[29]    See also, Ex. G, 8/26/99 E-mail Sillari to Hickson, 8/26/99: "When you pick up a file, make sure it is reserved correctly.  This is key on new files.  <u>You are the responsible person for this</u>."(emphasis in original).

[30]    At this stage, if the claim cannot be resolved and litigation is commenced, the claim moves to the litigation unit.  (The only exception to this procedure are "first notice" suits, which first come to litigation.  These are only a small percentage of the total claims processed by the office.  (Coyle Dep 246:22-23); Wallete Dep 74:20))

Department handled claims and set reserves (Wallete Dep 75:7-15), including four other supervisors (plus Wallete); in contrast, there were only four employees in the litigation Department at its most fully staffed.  Incredibly, defendant asserts in this litigation that Mrs. Coyle is responsible for the totality of the reserving problems in the office.

The RepWest Ivyland office underwent company-wide audits in 1999, 2000, and 2001 (see Ex. N).  These audit reports,  as well as internal e-mails, and the Claims Procedures Manual for the company, confirm that <u>everyone</u> in the office was supposed to reserve appropriately, and that problems identified in the audit relative to reserves showed a need for better training of <u>all</u> adjusters, and especially the "initial adjusters" in BI and SIU, outside the litigation unit.  <u>See</u>, e.g., Ex. U, Claims Procedure Manual (the "adjuster" sets the reserve, the "adjuster" evaluates it, etc.); 7/28/00 e-mail from Wallete to <u>all employees</u> in the office:

> "We will be conducting a reserve review of every file <u>upon receipt of the new desk adjuster report which will include a notepad from **each handling representative in the file** that the reserve is correct</u> for the facts and exposure in the file at that point.   You are accountable for the reserve in your file and will be placing your personal signature that the reserve is correct.  We continue to have major issues with older files being unreserved, claimants being not set up and various coding being incorrect.  . . . <u>*Yes, you will be held responsible if in fact the reserve is incorrect or untouched after you have given your personal guarantee all is well in the file*</u>."  (Italics  in original).[31]

In addition to the audits for which the company **has** produced documents, the company has failed to produce documents of a special audit of Mrs. Coyle in April, 2000– in which Mrs.

---

[31]    <u>See also</u>, 7/8/98 e-mail from Wallette to BI unit, re: referral to the litigation unit; "To Bodily Injury claim representatives: . . . All files you are handling in that are in suit at this time you must refer to the Litigation unit . . The handling representative referring the file is responsible and accountable for the condition and the investigation to date . . . <u>Make sure the reserve is accurate and proper</u>."

Coyle's files were found to be fine. Mrs. Coyle, unlike any other supervisor, had her files

specifically audited in April, 2000. (Coyle Dec, p. 7)  Auditor Cathy McNeil has testified that

Mrs. Coyle's files were appropriately reserved, that the office outside of the litigation unit had a

lot of problems, and that the BI unit was particularly bad. (McNeil Dec 1-2).  Ms. McNeil has

also testified that she completed spreadsheets each night of the audit, which were given to others

within the organization.  Defendants have denied that such an audit ever happened, and have

stated that they have no such documents. (Ex. V, Dft's Response to Plaintiff's Second Set of

Document Requests, no. 4).

   **2) BI and SIU, not Litigation, were the problem Departments within Republic**

**Western**.  Again, far from showing that Mrs. Coyle was the problem, the company audits and

other evidence demonstrate that the BI unit (which had the expensive bodily injury claims) and

the SIU unit (which investigated serious questionable losses) were repeatedly underperforming,

without discipline, which Mrs. Coyle brought to Wallete's attention:

> "Aside from personnel issues and poor past reviews by problematic adjusters, **the
> other main reason for underreserved files, as I have brought to your
> attention in March of this year, is new files entering my unit underreserved.
> approximately 50 files arrive in my unit from the bi units each month.  You
> stated that the prior supervisors were not responsible for correcting all of the
> problems in the files prior to my acceptance of these files.  Rather, it would
> require too much of the other supervisors.  So, my unit, upon receipt of a file,
> has a coding, claimant lines and reserving issues which all originated in the
> prior unit**.  Therefore, there are approximately 172 files that need attention and
> there is no assigned rep. . . . .Can you assist me in finding a solution to get the
> manpower to achieve the proper result?"

8/9/00 Coyle e-mail to Wallette. As detailed supra, Wallette refused to give her help.

   The validity of Mrs. Coyle's concerns were borne out by the company's auditors in the

May, 2000 audit report:

> "Reserving to exposure, <u>particularly in the casualty and SIU units</u>,
> is a major concern.  Our review of the aged inventory, although a

small sampling in the audit concerns us. We would recommend a review of all aged inventory and exposure in these units with particular attention to PIP, NY venue and SIU inventory. . . *We are particularly concerned about the timeliness of reserving to exposure in the casualty claims area [this is BI]. We would suggest that the management team review the current reserve practices and* **consider establishing a larger minimum case reserve on casualty claims for certain venues** *rather than waiting for demand packages before moving the case reserve amount. In many cases, demand packages are not received for over a year, which can have a negative impact on reserve development for the entire organization."*

Ex. N, May 2000 Audit, RW64 (Italics and bold in original; underline emphasis added)

Auditor McNeil also noted in this audit that she found "several files that were under-reserved and not in good order in units outside the litigation unit. There were large exposures in files outside the litigation unit, which should have been dealt with earlier. I remember BI (Bodily Injury) for example, was not reporting claims that should have been reported to me because of their size. I also had difficult getting the information I needed from the people in BI– they did not respond to my requests for information, and I felt Jim should have been a better manager in explaining our role to his people in that unit." (McNeil Dec, p. 1)(emphasis added)[32]

BI also failed in their responsibility to try to settle claims (which was obviously easier to do when the claim was in its pre-litigation stage, before the claimant hired an attorney); however, if a BI adjuster could just let the claim go into suit, that would push the file out into the litigation unit– which reduced the BI unit "numbers" of claims on hand. Later in 2000 the BI unit was still not doing its job; see, 8/11/00 e-mail Wallete to office, noting that HO was sending Thom Matush out to the office to correct the non-lit units' performance: "Matush has been

---

[32] The Ivyland BI unit was also slow in getting rid of old cases, see, 3/9/00 e-mail from Wallete to all Ivyland employees: "We are very distant from the goal and last in the BI average by office." Mrs. Coyle e-mailed Wallete on 3/8/00: "the files in suit arrive in the litigation unit with 750 days on average. There is no way I or my unit can change that fact." (RW 113).

assigned the responsibility for improvement in **litigation avoidance** in this office as HO feels we do not do a good job at it . . .**Avoid suits, settle claims**." )(emphasis added).[33]  This problem had not been corrected by the October, 2000 audit; the audit report referenced again the expectation that the initial handler make appropriate decisions on the claim (reserve and settlement), and that they were continuing to do so:  "It is apparent that suit avoidance handling needs to be established in this branch . . . One thing is evident; we need to set the standards for initial claim handling and evaluation during this project." (Ex. N, Oct. 2000, RW 68). [34]

In sum, in reviewing the audit documents produced by the company's auditors, both during and after Mrs. Coyle's tenure, there is much criticism of numerous employees and units in the office, particularly BI and Wallete.  There is nothing to support the claim that Mrs. Coyle is responsible for the office's reserve shortfall.

**3) Wallete's failure to discipline Terry Newman and Mike DiBenedetto, his buddies, kept in place two problem employees.**  Two members of Wallete's "old boys club" were particularly poor performers, but were kept in positions of great impact in the company.  Terry Newman, head of the troubled BI unit,  was a particularly weak performer, but was not disciplined for this (See Ex. N, Oct, 2000 audit, p. 3: "Terry is the weakest of the casualty supervisors .  .To be successful, he will need to commit to improving his supervisory skills and his technical knowledge. ." (RW 69 ); accord, Fusca Dec 3-4  (his files were in a mess); see also,

---

[33]  It was acknowledged internally that this failure of the BI unit negatively impacted the lit unit; BI supervisor Steve Sheft (he supervised one BI unit, Terry Newman the other) noted in an e-mail to his adjusters regarding this issue that "some of you are getting 'whacked' (**rather, you are allowing Lit to get "whacked"**) by not handling these claims properly and settling them  (8/11/00 email Sheft to Shea, etc)(emphasis added); (Wallete Dep 133;17-23).

[34]  Sillari also emphasized the role of the initial handler in setting reserves in an 8/25/99 e-mail to Wallete that BI adjusters must be told to "make sure all new files are investigated properly and reserved for exposure.  The key is to evaluate your reserve every time your adjuster looks at the file." (RW 120)(emphasis added).

3/8/00 e-mail from Schmitz to Wallete, noting Newman's failure to open up excess reserves for a serious claim involving plastic surgery required to face and forehead, fractured jaw; with medical expenses over $34,000, wage loss claim, and obviously significant pain and suffering damages, Newman reserved at only $20,000): "the extra policies should have been opened long before [the lit unit] got the file and in fact she may never have received the file had Terry recognized and properly instructed the rep.").   In fact, Wallete stated in his Deposition that he viewed Mr. Newman as being a particular expert in reserving matters, and that he and Mrs. Coyle took direction from him on this subject (Wallete Dep 104:3-4)(Ex. W, Newman Eval by Wallete:  "The litigation manager and I use his skills with reserving to double check some of the reporting we do on the 50/150/250 reserve report"(RW1120).[35]

DiBenedetto, Wallete's buddy, was also a poor performer in numerous standards as set forth supra at footnote 14.   He was in charge of reserving in his unit, SIU (Special Investigations Unit) (1/26/00 Wallete to Sillari e-mail), which, in addition to BI, handled extremely significant loss files.  Further, as admitted by defendants, this group also kept files longer, which forced them into litigation (and would at that point show up in Mrs. Coyle's unit, having already spent a long time in the SIU unit, where the reserves should have been kept accurately).[36]

---

[35]  The auditor noted that Mr. Newman had "the ability but we need his commitment"; despite request in discovery, defendants have produced no evidence that Mr. Newman was ever disciplined for this "lack of commitment" noted by the auditors, in contrast to Mrs. Coyle, who was written up by Wallete for a "lack of commitment" in leaving work to see her father after open heart surgery.  (Coyle Dep 242;9-18; Ex.Y, 8/29/00 EDP).  Again, this is disparate treatment.  Luciano v. the Olsten Group, supra.  In his Deposition, Wallete admitted that Terry was the weakest of the supervisors.  (Wallete Dep 103:20-21); despite this, he promoted Terry over Gina Fusca.

[36]  See, 1/26/00 email from Wallete to Sillari, (RW117): "did you consider SIU files increasing the suit count?  It plays a very big part in this office, probably big corporately.  We have over a hundred in this office alone, where suit occurs more likely than not because there is a delay in any offer while SIU investigates and eventually denies."  (Emphasis added).

### **3) Wallete, not Mrs. Coyle, was ultimately responsible for the accuracy of the reserves.**

As in most offices, Mr. Wallete, as head of the office, was ultimately responsible for the performance of the office in all respects  (Wallette Dep 10:13-15).  This included the office's performance in reserving (Wallete Dep 12:4-11); See also, Ex. S, Wallete evaluation, 6/26/00, ("Maintaining consistent reserving practices in all units" was noted under "Employee's [JIM's] assigned Departmental objectives in need of improvement."(RW 502).)[37]  This of course also included ultimate responsibility for the performance of Mrs. Coyle and her unit.  (Ex. U, Claims Procedure Manual, RW251: "RC MGR [regional manager, Wallete] will supervise the LC MGR regarding company policy, procedures, and the litigation Department responsibilities.").  Wallete touted his reserving abilities in his own hiring process with RepWest, billing himself as being a "Seasoned claim professional with over 24 years experience . . Experienced claims and legal auditor" with "Claim settlement and reserving authority of $300,000" at a previous job.  (See, Ex. X, Wallete resume).  If in fact the office was experiencing reserve problems, it was ultimately the responsibility of Mr. Wallete, not Mrs. Coyle.  Defendant Republic Western came to this conclusion in January, 2001, when it fired Wallete for failing in his duties as office manager with regard to his reserving function. (Wallete, 12:2-12).[38]

---

[37]    This is another instance of disparate treatment– while Wallete's failures in an important part of his job responsibilities were being noted– for which he received no termination warning– Wallete himself drafted a disciplinary document for Mrs. Coyle (which was never given prior to her leaving) that warned her that "failure to show the proper commitment" to her job may lead to immediate termination.  (Ex. Y, "Not Administered" 8/29/00 EDP for Coyle)

[38]    "Q: Can you tell me what you were told about your firing?  A: That as office manager, there were reserving deficiencies, and that the– they had basically put up $15 million in reserves to cover what they expected the reserves should have been in our files."  Ibid.

**4) Directives from the Home Office itself kept reserves low.**

RepWest itself discouraged increases to its reserves, apparently in an effort to avoid reporting a year-end financial shortfall.  In summer of 2000, home office issued a memo instructing that: 1) ANY reserve change requests over $25,000 had to go through home office; 2) there were to be NO changes in reserves for older files, and 3) reserve changes had to be documented with an e-mail to Home Office (7/28/00 e-mail from Wallete to office, 8/9/00 email Wallete to supervisors, subject:  Reserving guidelines from Hickson and Sillari, forwarding e-mail from Hickson; Coyle Dep 244:13-22; Wallete Dep 133:5-6; see also e-mail 8/10/00 from Sillari to Field Office Managers).  This made it much harder to increase the reserves on a particular claim, see Coyle Dec 6); see also 8/9/00 e-mail from Wallete to supervisors, supra, noting that : "Remember you will have to jump through hoops to get a [reserve] change, so be sure you need it . . . Do not post it until Ray approves it and I would keep a copy of his response e-mail" (emphasis added); accord, 7/28/00 e-mail Wallete to office and Wallete Dep 133:10-14).

In Hickson's forwarded e-mail, he notes as the reason for these new draconian guidelines the need for the company to present a better financial picture. (The company's reserve liability is reported on its financial documents (Wallete 13:19-22); obviously, a large reserve, as a liability, makes a company appear weaker.)   Hickson introduces the new reserving strictures by explaining,

> "Our budget profitably forecast going into this year was projected to be @ $25MM.  Our revised forecast considering June results and forecast through year end is now projected to be around $12MM.   The $12MM is only doable if everything is perfect in the assumptions used.  Needless to say nothing is ever perfect.  So the $12 MM is going to be a stretch to achieve– period.  On the U-haul side we had forecasted a small profit of $600K However indications are we will be at a $7.5 MM loss by year end. . . .What can be done to ensure we make the revised forecast or hopefully exceed . . .  "

(8/7/00 e-mail Hickson to Wallete).   He then lists the new reserving guidelines as part of how the company will present a better financial picture.  Obviously, if adjusters are pressured to keep reserves low (and are told they cannot increase the reserves on older files, WHATEVER the reason), the reserves will be kept low.  (Hickson emphasizes his points, saying, "I cannot see where exceptions should exist.") [39]  This manipulation of the reserve process and their own financials in a publicly-traded (and insurance-regulated) company hardly paints a favorable picture of RepWest and U-Haul's integrity.

In addition to making adjusters jump through hoops to get an increase in reserve authority, at one point the company trumpeted its "discovery" that a "glitch" in the computer system (the practice of automatically setting up a reserve for each line, rather than each claim) was resulting in the company's being severely overreserved, and that adjusters should go back in and reduce the overall reserve. (See 6/7/00 e-mail from Wallete, forwarding 6/6/00 email from Hickson, re:BAGL Losses charts; Hickson says: "After some in-Depth research we have found the problem in the reserve area . . . this results in approximately $6 m in potential over reserving in the BAGL [basic auto, general liability] . . . Please instruct the Field Offices to begin lowering reserves on the BI files . .")(emphasis added).   Again, there are many reasons, patently NOT attributable to Mrs.Coyle, for the reserve problems experienced at RepWest.[40]

Finally, plaintiff notes that the company has never provided, as requested by plaintiff in

_____

[39]  This memo also underlines the tight interrelationship between Republic Western and U-haul; RepWest policies on reserving were dictated by the needs and performance of U-Haul.

[40]  There were other problems with the reserving process: clerical errors in failing to get reserve changes translated to the computer screens ( Coyle Dep 128:21- 129:4 )(8/21/00 e-mail from Wallete to Beddis, et al; 4/15/99 email from Wallete to Coyle), a previous practice of the initial adjusters failing to set reserves AT ALL on some claims (5/30/00 e-mail from Wallete to Sillari), and failing to address the issue of a claimant's comparative negligence ("The issue of comparative negligence should be a component of every liability evaluation"(Ex. N, 1999 audit, RW 369 finding missed comp liab. issues in 15.8% of files reviewed)(emphasis added)).

discovery, a list of claims they aver plaintiff failed to reserve properly on, and the reasons supporting such a claim.[41]   Defendants' failure to provide actual evidence of this claim is not surprising, as there is none.

Not only was Mrs. Coyle obviously NOT the cause of the company's underreserve problem, she was personally and separately audited in April, 2000, by company auditors Cathy McNeil and Thom Matush, who found her files to be in good shape:

> We reviewed the files from the litigation unit managed by Ms. Coyle.  <u>Both Tom and I thought they were in good order.  We had been asked specifically to review the question of the adequacy of the reserves in those files, and Tom and I were both of the opinion that they were adequate and appropriate.</u>  I filled out scoresheets from this audit, which Thom then used to generate an audit.

McNeil Dec., p 1 (emph. added). Defendants have denied the existence of this audit and have claimed they cannot produce documents related thereto (See Ex. V, Defdt's Responses to Plaintiff's Second Set of Document Requests, no. 4).  As described by Ms. McNeil, who created the documents, these materials would belie defendants' claims about Mrs. Coyle.

 Ms. McNeil's findings were confirmed by the spring, 2000 audit of the entire office.  On the item of "reserve" adequacy, <u>the litigation Department received the highest score in the office</u>: 95% (See, spreadsheet attached hereto as Exhibit BB), column F (reserves).)  As auditor McNeil noted, Mrs. Coyle was being used as a "scapegoat" for problems in the Ivyland office outside her unit. (McNeil Dec., p. 2).

---

[41]    Nor did they produce, as requested, an identification of the other employees who took action on the reserves on each such disputed claim. (See, Ex. Z, Plaintiff's Third Set of Interrogatories, no. 2).  What defendants did produce was a four inch stack of documents, most of which were simply sheets of numbers and names with no narrative or explanation, and several of which did not even refer to the Ivyland office (RepWest had several regional offices); they were also not the documents produced in the audit.  (Ex. AA, 4/11/2003 letter from Mr. Horner to Ms. Falcao)(documents produced have been created for this litigation and "are meant to recreate work papers that had been prepared as part of the audit review process. This production was not the discovery ordered by this Court.

In its May 3, 2001 letter responding to Coyle's PHRC charge, defendant claimed that

"This audit [spring 2000] produced "substantial" increases in claim reserves previously

unrecognized that were directly attributable to Charging party's lack of diligence to her job."

(Ex. T, RW 58)(emphasis in original). This is simply false. As set forth above, the reserve issues

arose largely as the result of the BI unit's failures, Wallete's failures as a manager, and U-Haul's

policy of attempting to keep their reserves low by making adjusters "jump through hoops" to get

a reserve increase, an activity that resulted in the company's showing a better financial position

in their financial reports.  Mrs. Coyle was an excellent employee who received favorable reviews

and raises in each evaluation (Coyle Dep 30:22-31:1; Ex. O, Coyle 6/26/00 EDP; Ex. CC, Coyle

1999 EDP). [42]   She was constructively discharged by a pattern and practice of discriminating,

harassing behavior that drove her from her job, and was defamed and scapegoated for the

---

[42]   Defendant Wallete admitted in his deposition that he was generally pleased with Mrs. Coyle's performance.  (Wallete: 122-14-15).   Ms. Trimble recalls that "Lisa was a very hard worker.  She was a total go-to person.  I don't care what the problem was, she would listen to it and try to take care of it."  (Trimble Dec, p. 3).  Ms. Fusca "thought Lisa was a hard-working and dedicated employee."  (Fusca, p. 3).  Mike Hickson told her, "Thanks for all the hard work and your commitment to embrace change and improvements."  (4/25/00 email Hickson to Coyle). With regard to Mrs. Coyle's job focus, defendants' emphasis was always on suit volume reduction, NOT reserve analysis, which corporately-set goal she was very successful in.  See, e.g., 1/26/00 e-mail Wallete to Sillari, et al: "I have been stressing suit reduction for a year plus . . .".; Ex. DD, 1/28/99 Coaching session ("suit vol. is dropping at a steady pace")(RW 410); Ex. DD, 5/12/99 Coyle Employee Evaluation, listing Department objectives as "Reduction in suits by 20%, closing ratio of 101%, reduction in expenses paid by 10% and reduction in the average paid by 3% "(RW 416-422); Ex. EE,  2/17/00 Coaching session: "Suit numbers must be reduced by at least 10% in the unit in 2000");  Mrs. Coyle's 6/26/00 Employee Evaluation (Ex. O, RW 403-408): "All of Lisa's efforts have assisted the lit reps in the difficult task of getting to the goal of 75-125 per adjuster .  When Lisa arrived, the files numbered 1138.  At present the total files numbered 550 as of May 1999 and as of May 2000, Lisa has achieved a reduction to 490 files while raising the quality of each file and continuing to receive an average of 60 new litigation files each months in her unit.  Finally, Lisa has taken it upon herself to review each file beginning with the oldest and personally moving it to conclusion either by settling it on her own, placing the appropriate calls to plaintiff and defense counsel or meeting with the handling rep . . ."(RW 405).  RepWest gave her the specific task of managing and reducing litigation files– as the litigation manager– which she did.

failings of male employees in the office.

   For the reasons set forth herein, plaintiff respectfully requests that this Court grant summary judgment in her favor and against both defendants, on all counts of her Complaint.

         Respectfully submitted,


         _____
         LINDA P. FALCÃO (43725)
         **LAW OFFICES OF**
         **LINDA P. FALCÃO, ESQ., PC**
         238 Harrogate Road
         Wynnewood, PA  19096
         610-642-8091
   DATE:       Attorney for Plaintiff